AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
District of Delaware

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No. 23- 259M
INFORMATION ASSOCIATED WITH A FACEBOOK )
ACCOUNT THAT IS STORED AT PREMISES )
CONTROLLED BY META PLATFORMS, INC. )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § § 1591, 2421-2424, 1589, 1956 and 1957; and 21 USC § 841 and 846 | Sex trafficking, Mann Act, Forced Labor, Money Laundering, Distribution of/Conspiracy to distribute a controlled substance. |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____/s/ Kim Speakman_____
*Applicant's signature*

Kim Speakman, Special Agent, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____telephone_____ *(specify reliable electronic means)*.

Date: __06/07/2023__

*Judge's signature*

City and state: __Wilmington, DE__   Hon. Sherry R. Fallon, U.S. Magistrate Judge
*Printed name and title*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH INFORMATION ASSOCIATED WITH A FACEBOOK ACCOUNT THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | Case No. 23-<br><br>**FILED UNDER SEAL** |

<u>**AFFIDAVIT IN SUPPORT OF AN**</u>
<u>**APPLICATION FOR A SEARCH WARRANT**</u>

I, Kim Speakman, a Special Agent ("SA") of the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), Eastern Shore ("HSI Eastern Shore"), Maryland Office, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook account ("SUBJECT ACCOUNT") that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

2.     I am a Special Agent authorized to investigate violations of laws of the United States and execute warrants issued under the authority of the United States.  I have been employed by ICE/HSI since October 2010.  My government service began in 1997 with an initial contract

with the United States Air Force (active duty).  Pertinent to this affidavit and prior to my employment with ICE/HSI, beginning in 2004, I held the position of Special Agent with the Air Force Office of Special Investigations ("AFOSI").  As part of my daily duties as an HSI agent, I have conducted, participated in, and/or received training in numerous investigations of criminal activity, including, but not limited to, the investigation of narcotics offenses, money laundering, fraud, human trafficking, child exploitation and child pornography, alien smuggling, human trafficking, rape, assault, suicide, network intrusion and Title III wire communication interception investigations.  I have gained experience through training at the Federal Law Enforcement Training Center and through every day work relating to conducting these types of investigations. I have also received specific training in child exploitation and have had the opportunity to investigate and/or participate in numerous federal human trafficking cases.  During investigation of these matters, I have executed, and participated in the execution of, search warrants, and have seized evidence in connection with investigations of violations of the United States Code, Uniform Code of Military Justice and violations of the California Penal Code.  I have been the investigating officer and affiant of multiple applications for search warrants related to criminal offenses and violations of the United States Code and the California Penal Code.  I have participated in the planning and execution of several search warrants and arrest warrants involving various types of criminal violations.  In the course of my investigative duties, I have had contact—in the form of interviews and meetings—with human trafficking victims and those involved in the control of these victims (traffickers).

3.      As such, I am a federal law enforcement officer engaged in the enforcement of federal criminal laws, including 18 U.S.C. § 1591 (Sex Trafficking);  18 U.S.C. §§ 2421-

2

2424 (the Mann Act);  and 18 U.S.C. § 1589 (Forced Labor) ("SUBJECT OFFENSES").  I am authorized by the Secretary of the Department of Homeland Security to request the issuance of search warrants.

4.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  The information contained in this affidavit is based, in part, on my first-hand knowledge, information I have reviewed, as well as information given and explained to me by other law enforcement officers.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      The United States obtained a search warrant for the SUBJECT ACCOUNT on July 21, 2022, signed by the Honorable Christopher J. Burke, U.S. Magistrate Judge for the District of Delaware (Case No. 22-234M).  Based on the findings from that search warrant return, your affiant avers there is additional probable cause to believe that the SUBJECT ACCOUNT contains further evidence of the SUBJECT OFFENSES for the time period after the original warrant, as explained in more detail below.  There is thus probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.  Both Attachments are incorporated herein.

## SUBJECT OFFENSES

7.      The investigation concerns alleged violations of the SUBJECT OFFENSES,

3

which include: Title 18 U.S.C. § 1591 (Sex Trafficking); Title 18 U.S.C. §§ 2421-2424 (the Mann Act); and Title 18 U.S.C. § 1589 (Forced Labor).

a. In pertinent part, Title 18 U.S.C. § 1591 (Sex Trafficking) prohibits any person from knowingly, (1) in or affecting interstate commerce, recruiting, enticing, harboring, transporting, providing, obtaining, maintaining, patronizing, or soliciting by any means a person; or (2) benefitting financially or receiving anything of value from participation in a venture which has engaged in an act described in violation of (1) above, knowing, or in reckless disregard of the fact, that force, fraud, and coercion, or any combination of such means, would be used to cause the person to engage in commercial sex acts.

i. Per 18 U.S.C. § 1591(e)(2), "coercion" means (a) threats of serious harm to or physical restraint against any person; (b) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (c) the abuse or threatened abuse of law or the legal process.

ii. Per 18 U.S.C. § 1591(e)(3), "commercial sex act" means any sex act on account of which anything of value is given to or received by any person.

b. In pertinent part, Title 18 U.S.C §§ 2421-2424 (the Mann Act) prohibits any person from knowingly transporting a person in interstate commerce with the intent that the person engage in prostitution or any sexual activity for which any person may be charged with a criminal offense.

c. In pertinent part, Title 18 U.S.C. § 1589 (Forced Labor) prohibits any person from knowingly providing or obtaining the labor or services of a person by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another; by means of serious harm or threats of serious harm to that person or another; by means of the abuse or threatened abuse of law or legal process; or by means of a scheme, plan, or pattern intended to cause the person to believe that, if she did not perform such labor or services, she would suffer serious harm or physical restraint.

## BACKGROUND OF SEX TRAFFICKING/DEFINITIONS

8.    Through my investigations, training, and experience, I have learned that individuals who engage in the sex and labor trafficking of others target individuals who are particularly vulnerable, such as drug addicts, and often use violence, drugs and drug addiction, alcohol, threats,

and manipulation to maintain control over the individuals they cause (through fraud, force, or coercion) to engage in commercial sex or forced labor.  Additionally, traffickers use fraud such as romance schemes to defraud or coerce their victims.  In both types of trafficking, physical violence and threats, manipulation of drug addiction, coupled with intermittent acts of kindness, are often used to increase the victims' emotional and physical dependence on the traffickers.  The traffickers also generally have rules and forms of discipline that they typically use to maintain order and compliance over their victims.

9.     The term "date" refers to an instance of commercial sex.  The term "date" also may refer to a person, commonly referred to as a "John", who buys commercial sex.

10.     The term "bottom" or "bottom bitch" typically refers to a woman designated by the trafficker to supervise or control the other victims and/or help manage the sex trafficking business. The "bottom" often acts as an enforcer and the trafficker's right-hand person, performing such duties as instructing victims on how to post commercial sex advertisements, posting such advertisements, collecting money, booking hotel rooms, punishing the victims for disobeying rules, or reporting disobedience to the trafficker.

11.     Backpage.com was a commercial advertising website used to buy and sell items. Backpage.com also had an adult section commonly seen by law enforcement to contain ads soliciting commercial sex for money and was commonly used by sex traffickers to advertise victims for commercial sex.  In order to post an advertisement on Backpage.com, the user established an account by providing an email address and password. The email address became that particular account's username. In April 2018, the Department of Justice took down and seized Backpage.com.  As such, Backpage.com is no longer active.  But the Federal Bureau of Investigation has possession of Backpage.com's servers and, as a result, ads posted on

Backpage.com.

12.    "Incalls" are when a hotel room or other venue is secured by a trafficker, pimp, or prostitute for the purposes of performing commercial sex acts.  "Outcalls" are when an individual performing commercial sex acts travels to a location where a "John" is already located.

13.    "Forced labor" services or labor may include domestic chores such as cleaning, cooking, and yard work, personal care such as massages, childcare, working in a business or restaurant, stealing or "boosting," or any task which the target compels the victim to undertake through fear of serious harm or other means listed in 18 U.S.C. § 1589.

14.    The term "boosting" is used to describe the practice of shoplifting items in order to resell them for cash.

15.    The term "dope sick" is used to describe opiate withdrawal symptoms such as the symptoms an addict experiences when the addict has not used heroin for a period of time or has used less heroin than usual.  The physical side effects are intensely uncomfortable and include nausea, vomiting, insomnia, body aches, and diarrhea.  Addicts often continue to use drugs solely to avoid becoming dope sick.

**<u>USE OF FACEBOOK IN CRIMINAL ACTIVITY</u>**

16.    Based on my training and experience, I know that people who commit crimes often use social media applications such as Facebook in ways that reveal their activities before, after, or while engaging in criminal activity.  For example, this may include application usage information (*e.g.*, times that the application is used), chats, and images or video recordings relevant to the criminal activity.  Furthermore, I know from training and experience that Facebook, which enables communication with others, often includes communications that shed light on the user's location

6

and activity during a particular time period.

17.    Based on my training and experience, I know that perpetrators of crime, particularly individuals involved in sex trafficking and forced labor, often communicate with others before, during, and after the crime.  They communicate using Facebook, text messaging, apps, other social media, photographs, audio and/or video recordings, etc.  In my training and experience, such communications have revealed the identities and relationships between and among the involved individuals, as well as their means, motive, hostility, knowledge, and intent relating to the crime. Moreover, such communications have also revealed consciousness of guilt and efforts to impede police investigations.

18.    Based on my training and experience, I know that individuals involved in criminal activity often use social media sites like Facebook to learn the status of a criminal investigation, *i.e.*, look up the newspaper articles about the crime, determine if the police have suspects, learn the identity of witnesses, or keep track of witnesses.

19.    Furthermore, based on my training and experience, I know that traffickers often use Facebook and other social media sites and applications to contact victims and potential recruits, to take photos and place online advertisements for commercial sex, to communicate with commercial sex buyers, and to facilitate the trafficking business and communicate with co-conspirators.  In addition, traffickers use Facebook and other social media sites and applications to reach out to victims after victims have run away to either intimidate victims into not reporting to law enforcement or to persuade them to return to commercial sex work.  Sex traffickers also are commonly recruiting and meeting their victims, as well as setting up commercial sex with Johns, with increased regularity via social media such as Facebook, Instagram, Snapchat, and other popular social media applications.  Traffickers use these platforms to promote their lifestyles,

7

wealth, and belongings as a way to recruit victims into their scheme.

20.     Based on my training and experience, I know that those who boost items often use Facebook and other social media sites and applications to upload photos and place online advertisements to sell stolen items, to communicate with potential buyers of stolen items, and to facilitate the trafficking business and communicate with co-conspirators.  I also know that labor traffickers often use Facebook and other social media sites and applications to reach out to victims after victims have run away to either intimidate victims into not reporting to law enforcement or to persuade them to return to laboring for the trafficker.

## STATEMENT OF PROBABLE CAUSE

### Background of Investigation

21.     On April 13, 2023, a Grand Jury for the District of Delaware returned a seventeen-count indictment against Clifton Gibbs ("GIBBS") and Brooke Waters ("WATERS") (collectively, "the Defendants"), charging them with committing, and aiding and abetting each other to commit, nine counts of sex trafficking, six counts of labor trafficking, and one count each of the Mann Act.  The indictment alleges 13 victims, referred to in the indictment as Victims 1 through 13.  The victims will be referred to in the same manner herein.  On April 13, 2023, the United States District Court for the District of Delaware issued warrants for the Defendants' arrests, and those arrests were executed on May 10, 2023.

22.     The federal investigation of the Defendants began in February 2015, when local law enforcement arrested GIBBS and WATERS, along with Victims 5 and 6, in two separate

incidents in Ocean City, Maryland.  Law enforcement initiated a traffic stop of GIBBS' vehicle. Upon a consent search of Victim 5's purse and subsequent search of the vehicle (registered to GIBBS), law enforcement located heroin, cocaine, and drug paraphernalia.  As a result, GIBBS was charged with possession of cocaine.  Separately, law enforcement encountered WATERS and Victim 6 in another vehicle outside of a Quality Inn Hotel and conducted a welfare check on WATERS, who appeared to be under the effects of narcotics.  Law enforcement discovered 11 bags of heroin on WATERS' person and charged her with possession of heroin.

23.    It was later determined that GIBBS and WATERS had posted advertisements for dates with Victims 5 and 6 on Backpage.com and transported them to Maryland for the purpose of commercial sex.[1]  HSI Special Agents and Ocean City Police Department officers interviewed Victims 5 and 6, as well as GIBBS after he waived *Miranda*.  When he was shown recent Backpage.com advertisements of Victim 5 and Victim 6, GIBBS admitted that the photos appeared to be taken inside his home in Lewes, DE, but claimed that he did not know who took the photos and denied any involvement in prostitution activities.   WATERS also waived *Miranda*, but was experiencing withdrawal symptoms and could not be interviewed.  Victims 5 and 6 informed law enforcement that they were engaging in commercial sex to repay GIBBS and WATERS for illicit drugs and housing.  These initial statements by Victims 5 and 6 raised suspicions that GIBBS and WATERS might be coercing the women to engage in commercial sex.

24.    In subsequent interviews with the various Victims, the government learned that

---

[1] This conduct is captured in Count 16 of the indictment.

soon after Victims 1 through 13 arrived at one of the properties used by the Defendants, GIBBS used his knowledge of the Victims' living situations, finances, and drug addictions—and their fear of painful withdrawal symptoms— to exploit their vulnerabilities and to create an atmosphere in which Victims had to pay for the expenses they incurred, or would obtain, thereby establishing a "debt," and to pay for future drugs which GIBBS and WATERS knew the Victims would need to avoid withdrawal sickness, as well as ongoing housing provided. .  While at the isolated and/or rural locations, the Defendants controlled the Victims' access to drugs (they would not permit the Victims to buy drugs from anyone else while they were working for and/or living with GIBBS) and used the Victims' inevitable dope-sickness and fear of dope-sickness, among other tactics, to coerce them to engage in commercial sex acts, boosting, panhandling, providing childcare for GIBBS' minor children, and burning trash and performing manual labor on all the properties.

25.    After doing dates, boosting, or performing other money-making activities, the Defendants required the Victims to turn over the money, often cash, they made before supplying them with additional narcotics.  WATERS purported to keep track of how much money the Victims owed, and some of the Victims kept track of how much money they generated in relation to the amount of drugs supplied to them.  Victim statements often indicated that the amount of drugs provided was not equal to the amount of revenue generated.

26.    In 2022, while represented by counsel, WATERS sat voluntarily for three interviews with HSI agents and federal prosecutors.  WATERS explained that she had been in an episodic romantic relationship with GIBBS for over ten years and acknowledged that she served as his "bottom ho" for his commercial sex business.  During those interviews, WATERS

provided significant corroborative information regarding the SUBJECT OFFENSES. WATERS ultimately decided to cease her cooperation and went back to GIBBS in or around May 2022.

27.     Despite facing charges in Maryland and knowing that HSI was investigating them, GIBBS and WATERS, as alleged in the Indictment, continued their criminal conduct until at least 2020. Additional evidence from Facebook, however, suggests that the Defendants engaged in similar conduct into 2022.

**GIBBS'/WATERS' Use of Facebook in Their Sex Trafficking and Forced Labor Scheme**

28.     The government knows from Victim interviews and meetings with WATERS that Facebook was a central component of the Defendants' criminal operation, both sex trafficking and forced labor. With respect to sex trafficking, Facebook is one of the methods GIBBS utilized to recruit women. With respect to forced labor, GIBBS and WATERS would often resell the items on Facebook Marketplace.

29.     For example, WATERS' Facebook account, "brooklyn.davidson.3," showed that in 2019 she sent photos of specific items to steal to Victim 12. In 2020, WATERS chatted with Victim 13 about specific grocery items to boost. In her interview on March 17, 2022, WATERS admitted to advertising boosted items for resale on Facebook. The return of her account showed that between March and July 2020, she posted photos of small electronics and power tools for sale. In her interview, WATERS said that after posting an item for resale, she would handle the meet-up, collect the money, and give it to GIBBS.

30.     As another example, Victim 12 stated that she communicated with GIBBS via Facebook Messenger. According to Victim 12, GIBBS often took her phone from her overnight and would bring it back the next day. When she received her phone back, she saw that GIBBS

used her Facebook Messenger account to talk with women she knew from the methadone clinic. He would also ask Victim 12 questions about these women – specifically about their drug addictions.  Victim 12 said that at least two women did come to GIBBS' property after being connected to him through her Facebook account.

31.     The government also obtained a search warrant for Victim 9's Facebook account. That return showed that her account was used to set-up more than 80 dates between May and October 2020.  During an interview on December 21, 2021, Victim 9 stated that GIBBS directed her to stay signed into her Facebook account on his phone and told her what to say, set up dates himself, or directed Victim 12 to set up the dates.  Victim 9 did not recognize having sent the texts, but did recall doing many dates in the Wawa parking lot—the location given in one of the chats setting up a date.

32.     On or about July 21, 2022, your affiant served a search warrant upon Facebook for GIBBS' account.  The return was approximately 89,000 pages.  After conducting a thorough review of the return, the investigative team saw that GIBBS used his account to communicate with multiple drug-addicted women, including some of the Victims and other witnesses known to your affiant, including into 2022.

33.     For example, in March 2022, GIBBS used Facebook to communicate with an individual, HO, who purports to be a woman who runs a non-profit organization that helps incarcerated women.  A review of law enforcement databases revealed that HO is an alias for an adult man.  The chats establish that HO intended to connect GIBBS with two incarcerated women who would sell photographs to him, and financial records obtained from Western Union for GIBBS' account corroborate that GIBBS sent money to HO on several occasions.  In one of his

chats with HO, GIBBS said that he was "looking fir someone to be released and wanting to relocate." GIBBS then said that one of the incarcerated women "rubbed" him the right way and he was ready to send her a "ticket to Delaware to set her up in one of my houses and help her get straightened out." Both women were incarcerated due to drug offenses, conspiracy to distribute methamphetamine and possession with intent to distribute methamphetamine. Based on the totality of this investigation, there is probable cause to believe that GIBBS was utilizing the same recruitment scheme in relation to vulnerable incarcerated persons, particularly those with apparent connections to substance abuse, that he utilized on many of the Victims.

34.     Between April and July, 2022, GIBBS used Facebook to chat with ER, a woman he had never personally met, about the possibility of her cooking, cleaning, and keeping house for him. During the chat, ER, explained that she was addicted to opiates, pregnant, and "wanted" by law enforcement. Nevertheless, GIBBS said he would "make sure all [her] needs are met and a place to stay" and did not care that she was "wanted." When your affiant subsequently interviewed ER she confirmed that she had never met GIBBS in-person and did not end up meeting him or going to his properties because she was scared. Based on the totality of this investigation, there is probable cause to believe that GIBBS was utilizing the same recruitment techniques on ER, a vulnerable and drug-addicted person, that he used on many of the Victims.

35.     In addition to communicating with women in the United States, in late 2021 and early 2022, GIBBS used Facebook to chat with RG, a Filipino woman, who ultimately sent photos of herself in lingerie to GIBBS in exchange for money. Financial records from GIBBS' account at Western Union, along with details relating to payment found in his Facebook chat with RG, showed that GIBBS sent money for RG to an address in the Philippines.

13

36.     Based on GIBBS' consistent use of Facebook to perpetrate the SUBJECT OFFENSES, even after he was aware that he was under investigation, your affiant has reason to believe that additional evidence of the SUBJECT OFFENSES exists in GIBBS' Facebook account post-July 2022.

## TECHNICAL BACKGROUND OF FACEBOOK

37.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.   Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

38.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

39.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

40.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

41.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

42.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes.  Users can "tag" other users in a photo or video, and can be tagged by others.  When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

43.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, and video.  Meta retains instant messages and certain other shared Messenger content

unless deleted by the user, and also retains transactional records related to voice and video chats, such as the date and duration of each call. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

44.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

45.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

46.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

47.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

48.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

49.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

50.    Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP addresses used to take certain actions on the platform.  For example, when a user uploads a photo, the user's IP address is retained by Meta, along with a timestamp.

51.    Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

52.    Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

53.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

54.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## CONCLUSION

55.     Based on the foregoing, I request that the Court issue the proposed search warrant.

56.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Meta.  Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

*/s/ Kim Speakman*
Kim Speakman
Special Agent
Homeland Security Investigations

Sworn to me over the telephone and signed by me pursuant to
Fed. R. Crim. P. 4.1 on this ___7th___ day of June, 2023:

HONORABLE SHERRY R. FALLON
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the SUBJECT FACEBOOK ACCOUNT, listed below, that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

**cliff.gibbs.733, Profile ID 100028697932492**

## ATTACHMENT B

### Information to be disclosed by Meta Platforms, Inc. ("Meta")

To the extent the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing each user's posts and other Facebook activities **from July 22, 2022 to Present**;

(c)     All photos and videos uploaded by that user's ID and all photos and videos uploaded by any user that have that user tagged in them **from July 22, 2022 to Present**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

2

(e)    All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)    All other records and contents of communications and messages made or received by each user **from July 22, 2022 to Present**, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)    All "check ins" and other location information;

(h)    All IP logs, including all records of the IP addresses that logged into the account;

(i)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)    All information about the Facebook pages that the account is or was a "fan" of;

(k)    All past and present lists of friends created by the account;

(l)    All records of Facebook searches performed by each user's account **from July 22, 2022 to Present**;

(m)    All information about each users' access and use of Facebook Marketplace;

(n)    The types of service utilized by each user;

(o)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Meta and any person regarding each user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within **14 DAYS** of issuance of this warrant.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of the SUBJECT OFFENSES listed in the Affidavit, involving CLIFTON GIBBS and BROOKE WATERS since 2022, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a)     Records, including communications, advertisements, contact lists, and photos, relating to the facilitation of commercial sex and the recruitment of individuals for that purpose;

(b)     Records, including communications, advertisements, contact lists, and photos, relating to the facilitation of boosting and the recruitment of individuals for that purpose;

(c)     Records, including communications, advertisements, contact lists, and photos, relating to the facilitation of household work and the recruitment of individuals for that purpose;

(d)     Records, including communications, advertisements, contact lists, and photos, relating to the facilitation of childcare and the recruitment of individuals for that purpose;

(e)     Records, including communications, advertisements, contact lists, and photos, relating to the sale of drugs or use of drugs;

(f)     Communications between GIBBS and known Victims or other potential victims of trafficking;

(g)     Communications between WATERS and known Victims or other potential victims of trafficking;

(h) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(i) Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

(j) The identity of the person(s) who created or used the user IDs.

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

❑ Original          ❑ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Delaware

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No.  23- 259M |
| INFORMATION ASSOCIATED WITH A FACEBOOK | ) |
| ACCOUNT THAT IS STORED AT PREMISES | ) |
| CONTROLLED BY META PLATFORMS, INC. | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____June 21, 2023_____ *(not to exceed 14 days)*
❑ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____the duty U.S. magistrate judge_____ .
*(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❑ for _____ days *(not to exceed 30)*   ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued:   06/07/2023  12:43 p.m.          _____
*Judge's signature*

City and state:   Wilmington, DE          Hon. Sherry R. Fallon,  U.S. Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>23- | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____


_____
*Executing officer's signature*


_____
*Printed name and title*